AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
11/04/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KM _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
Nov. 4, 2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ch _____ DEPUTY

United States of America

v.

JORGE VASQUEZ,

Defendant.

Case No.  **2:25-MJ-06888-DUTY**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about the dates of October 1, 2023, and November 3, 2025, in the county of Santa Barbara in the

Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1351 | Fraud in Foreign Labor Contracting |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Michael Blas*
*Complainant's signature*

_____
Michael Blas, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  **November 4, 2025**

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Brianna Fuller Mircheff, U.S. Magistrate Judge
*Printed name and title*

AUSA:__ Nicholas Purcell, x3752 _____

## AFFIDAVIT

I, Michael Blas, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against and arrest warrant for **JORGE VASQUEZ** ("**VASQUEZ**") for a violation of 18 U.S.C. § 1351 (Fraud in Foreign Labor Contracting).

2.    This affidavit is also made in support of an application for a warrant to search the following:

a.    The residence of **JORGE VASQUEZ** ("**VASQUEZ**") and **GABRIELA LOPEZ** ("**LOPEZ**"), a single-family residence located at 1956 Cambridge Way, Santa Maria, CA 93454, as described further in Attachment A-1 (the "**SUBJECT PREMISES**");

b.    The person of **VASQUEZ**, as described further in Attachment A-2; and

c.    The person of **LOPEZ**, as described further in Attachment A-3.

3.    The requested search warrants seek authorization to seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy to Defraud the United States); 18 U.S.C. § 1341 (Mail Fraud); 18 U.S.C. § 1546 (Visa Fraud); and 18 U.S.C. § 1351 (Fraud in Foreign Labor Contracting) (collectively, the "Subject Offenses").

4.    Attachments A-1 through A-3, and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses, including from my personal review of records and documents and communications with other investigators with the DOL-OIG, U.S. Department of State – Diplomatic Security Service, Homeland Security Investigations, and the U.S. Department of Labor – Wage and Hour Division ("DOL-WHD"). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of our investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. **BACKGROUND OF AFFIANT**

6.    I am a Special Agent ("SA") with the United States Department of Labor - Office of Inspector General ("DOL-OIG") and have been so employed since September 2006. I am presently assigned to the Los Angeles Office. As a DOL-OIG Special Agent, my duties include investigating fraud, waste, and abuse of various Department of Labor programs. I have conducted investigations of criminal activity involving labor exploitation, employment-based visa fraud, unemployment insurance fraud, workers' compensation fraud, money laundering, embezzlement of union funds, and labor racketeering. I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center located in Brunswick, Georgia.

7.     From my training and experience, I am familiar with the criminal methods and manners of those devising and executing schemes to defraud the labor visa program, including the ways in which those committing fraud use digital devices to plan and execute such schemes.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

8.     Based on my personal observations, my training and experience, information obtained from various law enforcement personnel and witnesses, and my own investigation, including from my personal review of records and documents and communications with other investigators with the DOL-OIG, U.S. Department of State – Diplomatic Security Service, Homeland Security Investigations, and the DOL-WHD, I am aware of the following:

9.     The DOL-OIG, U.S. Department of State – Diplomatic Security Service, and Homeland Security Investigations are investigating **VASQUEZ** for a scheme to exploit foreign workers and smuggle foreign nationals to the United States under the disguise of temporary non-immigrant workers. The following details are based on information received via witness interviews, consensually monitored phone calls with the subjects, surveillance, and a review and analysis of petitions filed with the DOL and United States Citizenship and Immigration Services ("USCIS") relating to **VASQUEZ** and/or his co-conspirators.

10.  **VASQUEZ** runs a recruitment service that serves agricultural employers in the Southwest United States by

fulfilling their need for temporary foreign workers. With the participation and assistance of others, including his spouse **LOPEZ, VASQUEZ** directed a visa fraud scheme that involved the following: (1) selling H-2A Temporary Agricultural labor visas (H-2A visa); (2) making false statements to the United States government relating to charging prohibited fees to H-2A workers; (3) inflating the number of workers on the H-2A petition with the intent to employ the workers in agricultural and non-agricultural occupations at employers not identified on the petition; (4) smuggling foreign nationals into the United States via H-2A visas in exchange for money, with no intent to employ and/or ensure the alien returns to their county of origin when the visa expires.

11.  According to USCIS, at least seven petitions for foreign workers were filed for Cuyama Valley Farms LLC and JJB Farm LLC, resulting in the approval of at least 163 known H-2A visas from September 2023 through present.

12.  Based on interview statements of current H-2A workers, as well as a report to USCIS of workers **VASQUEZ** brought to the United States (who subsequently absconded), I believe the majority of the 163 visa beneficiaries agreed to pay **VASQUEZ** at least $8,000 in exchange for the H-2A visas. In some instances, the beneficiaries paid $14,000 to $17,000 for H-2A visas that enabled them to illegally enter the United States and work anywhere in the country. The H-2A beneficiaries are suspected of working at other non-approved employers in the United States with no intention of returning to their country of origin.

**VASQUEZ** and his co-conspirators, including **LOPEZ**, concealed their fraudulent recruitment activities by failing to disclose the $8,000 to $17,000 fees charged to beneficiaries for the H-2A visa on at least two I-129s signed by the owners of Cuyama Valley Farms LLC (Jose Luis TORRES) and JJB Farm LLC (Jesus Armando Jiminez BOJORGES).

13.   In addition to the visa fraud and smuggling scheme, interviews of current H-2A beneficiaries revealed **VASQUEZ** also defrauded the H-2A beneficiaries employed at Cuyama Valley Farms and JJB Farm by applying prohibited payroll deductions to the pay of H-2A workers weekly salaries for the cost of lodging and transportation as a condition of their employment in the United States. Cuyama Valley Farms and JJB Farm failed to disclose the deductions as a condition of employment in the United States to the beneficiaries when they were recruited in Mexico.

### A.    BACKGROUND: H-2A APPLICATION PROCESS

14.   If a United States employer cannot find workers that are able, willing, qualified, and available to perform temporary and seasonal agricultural employment, the employer may seek to employ a foreign worker (i.e., an alien) by filing a nonimmigrant petition seeking a temporary employment visa for the alien. The petition must be filed with DOL and USCIS. An employer seeking to employ a non-immigrant alien temporarily or seasonally in agricultural employment may obtain the services of foreign workers through the H-2A labor visa program.

15.   The H-2A program is authorized by the Immigrant Reform and Control Act ("IRCA") of 1986. The intent of the H-2A

regulations is to ensure no United States workers are displaced due to the H-2A Program. Potential H-2A employers must demonstrate that they have attempted to recruit and hire available United States workers prior to the certification for H-2A workers.

16.  Under the H-2A program, the two types of entities that may petition for H-2A workers are an Agricultural Employer ("AGER") or H-2A Labor Contractor ("H-2A LC"). An AGER is defined as a fixed site employer, which is generally made up of farm owners, employees of farm owners, owners or employees of harvesting companies that service farm owners, and/or agricultural associations. H-2A LC's, on the other hand, tend not to have a direct business interest in the farming or harvesting of crops, but rather engage in the employment, recruitment, soliciting, hiring, furnishing, housing, or transportation of H-2A workers. In essence, these contractors specialize in assisting AGERs with navigating the H-2A program by offering recruitment, placement, and other services AGERs need to comply with when petitioning and employing H-2A workers. The requesting employer is traditionally referred to as the "petitioner," and the alien is referred to as the "beneficiary."

17.  An AGER or H-2A LC (collectively, "the employer") that wishes to use foreign workers for H-2A temporary or seasonal agricultural employment must first file a job order with the DOL via the Employee Training Administration ("ETA") Form 790 ("H-2A Agricultural Food Processing Clearance Order"). ETA Form 790, commonly referred to as the "job order," is filed with the state

workforce agency ("SWA") where the work will be performed. Among other things, ETA Form 790 includes information relating to wages, hours, duration, area of employment, type of work, free housing, and transportation guarantees. By signing ETA Form 790, the applicant promises both the DOL and the beneficiary (H-2A worker) that he or she will abide by the guarantees in the job offer. Such guarantees include offering the same benefits, wages, and working conditions to United States workers; not imposing any restrictions or obligations on United States workers not imposed on the H-2A workers; and ensuring the job qualifications and requirements are consistent with the normal and accepted qualifications required by employers that do not use H-2A workers in comparable occupations. Failure to abide by the guarantees in the job offer can result in the labor certification and/or visa being revoked, as well as monetary penalties imposed by DOL-WHD.

18.  Acceptance of ETA Form 790 by the SWA requires the employer to engage in positive recruitment of United States workers. Positive recruitment includes advertising the job openings in local newspapers and contacting former United States employees regarding the employment opportunity. Following the acceptance of ETA Form 790, the employer must file ETA Form 9142 (Application for Temporary Employment Certification) with the DOL Office of Foreign Labor Certification ("OFLC"). The applications can be filed electronically, or by mailing to the OFLC's National Processing Center ("NPC") in Chicago, Illinois. As part of the petition to the DOL, the employer must make

certain attestations, under penalty of perjury, including:

      a.   The employer is offering terms and working conditions normal to United States workers similarly employed in the area of intended employment;

      b.   The employer will comply with the applicable Federal, State, and local employment-related laws and regulations, including employment-related health and safety laws;

      c.   The employer is offering a wage that equals or exceeds the highest of the following: the prevailing wage, the applicable federal minimum wage, the state minimum wage, and local minimum wage, and the employer will pay the offered wage during the entire period of the approved H-2A labor certification; and

      d.   The employer has not sought or received payment of any kind from the employee for any activity related to obtaining the labor certification, including payment of the employer's attorneys' fees or recruitment costs. Payment includes, but is not limited to, monetary payments, wage concessions (including deductions from wages, salary, or benefits), kickbacks, bribes, tributes, in kind payments, and free labor.

19. ETA Forms 790 and 9142, read jointly, often serve as the written work contract for the H-2A workers if no separate contract exists. During the review process, the employer is expected to continue engaging in positive recruitment of United States workers, which includes the placement of a newspaper ad

advertising the job openings. Following the receipt of a recruitment report, proof of housing inspection and workers compensation insurance, the NPC decides whether to grant the employer a Temporary Labor Certification ("TLC").

20.   If the DOL approves ETA Form 9142, the employer must then file with USCIS a copy of the ETA Form 9142 and USCIS Form I-129 (Petition for Non-Immigrant Worker). USCIS has a Western Service Center in Laguna Niguel, California, where all I-129 petitions relating to H-2A beneficiaries are received by mail from petitioners throughout the United States. All files opened in Laguna Niguel are identified with the file number beginning with "WAC".

21.   In Form I-129, the employer must provide, under penalty of perjury, the number of hours per week to be worked and the hourly wage rate. In addition, the employer must answer certain questions under penalty of perjury including, but not limited to, whether the workers that the employer has located or plans to hire have paid the employer, or any service agent, any form of compensation as a condition of the employment; or whether the employer and such workers have an agreement through which the worker will, at a later date, pay the employer for government visa fees or other fees for which the worker is responsible. Additionally, Form I-129 requires the filer to identify any staffing agency and/or recruiter that was used to recruit the H-2A workers.

22.   In many instances, Form I-129 is prepared and filed on behalf of the petitioner or employer and alien beneficiaries by

a "preparer," which may include law firms or other persons or businesses claiming to have expertise in the field of immigration benefits and visas. In the event the petition is completed by a preparer, Form I-129 contains a section where the preparer must sign and include his/her identifying information. A preparer is also required to file a Notice of Entry of Appearance as Attorney or Accredited Representative on USCIS Form G-28 ("Notice of Entry of Appearance as Attorney or Accredited Representative"), on which the preparer must indicate if s/he is an attorney or accredited representative.

23. Form I-129 requires petitioners to certify that the petition and the evidence submitted with it is true and correct and that they are empowered to file the form, under penalty of perjury and subject to penalties, including criminal prosecution. If a Form I-129 is not signed, it will not be considered properly filed.

24. If USCIS approves the Form I-129, the employer may assist the visa beneficiary (i.e., the worker) to apply for a visa with the State Department through a Form DS-160 submitted electronically to the State Department's website. Consular Officers use the information entered on the Form DS-160 to process the visa application and, combined with a personal interview, determine an applicant's eligibility for a nonimmigrant visa.

25. If the Department of State approves the visa application, a temporary H-2A employment visa is issued to the

alien for a period of up to three years. In general, H-2A visa approvals do not exceed a one-year period.

      **B.**      **H-2A APPLICABLE LAWS**

26.  Once H-2A workers are approved to work in the United States, ETA Form 790 and 9142 ("the work contract"), along with the Fair Labor Standards Act ("FLSA"), Occupational Safety and Health Act of 1970 ("OSHA"), and the Field Sanitation Provisions of the Occupational Safety and Health Act of 1970 provide protections for the H-2A workers with respect to their wages, housing, transportation, disclosures, and recordkeeping.

27.  While the H-2A workers have legal immigration status, the Migrant and Seasonal Agricultural Worker Protection Act ("MSPA") does apply. Protections under the MSPA only apply to aliens brought in under the H-2A program when the H-2A worker loses his/her immigration status yet continues to be employed by the certified H-2A employer. The DOL-WHD is tasked with protecting employment standards relating to wages, housing, transportation, disclosures, and recordkeeping in accordance with the work contract or ETA 790/9142 while H-2A workers are in H-2A status.

28.  Generally speaking, the MSPA also applies to any person (or business) that recruits, solicits, hires, employs, furnishes, or transports migrant or seasonal agricultural workers (the MSPA refers to these activities as "farm labor contracting activities"). Before performing any "farm labor contracting activities," farm labor contractors are required to submit Form WH-530 to the DOL-WHD for a Certificate of

Registration authorizing the applicant to engage in "farm labor contracting activities." There are special registration requirements for farm labor contractors that intend to house, transport, or drive migrant or seasonal agricultural workers. For example, if an employer seeks to house the workers, the employer must apply for a Housing Occupancy Certificate. The DOL-WHD is responsible for enforcing most provisions related to the H-2A program.

29.  Temporary, nonimmigrant foreign workers admitted under H-2A visas may remain in the United States only as long as the certification lasts. When the certification has ended, the workers are no longer considered to be in H-2A status. Moreover, if for any reason the employment relationship ends before the end of the certification period due to the employee quitting, the employer terminating employment, or the H-2A visa expiring, the worker must leave the United States. Under 8 C.F.R. 214.2(h)(5)(VI)(A), an employer of an H-2A worker must notify USCIS within 24 hours of an H-2A worker absconding.

30.  An employer who hires or continues to hire an H-2A worker beyond the time that the certification has expired is in violation of the prohibition against employing unauthorized aliens, found in section 274A of the Immigration and Nationality Act and is in violation of Title 8 U.S.C § 1324(a) (Unlawful Employment of Aliens).

C.    **PROHIBITION AGAINST EMPLOYEES PAYING FEES**

31.  Under the H-2A program, employers and their agents are prohibited from seeking or receiving payments from workers for

any activity related to obtaining a labor certification. Payments are defined to include monetary payments, wage concessions (including deductions from wages, salary or benefits), kickbacks, bribes, tributes, in-kind payments, and free labor. In addition to direct employers, domestic and foreign recruiters, agents, or labor contractors engaged by the employer, either directly or indirectly, are also prohibited from seeking or receiving any payment from prospective employees. The deductions specifically prohibited under the H-2A program are as follows:

      a.   Employer's attorney fees, application fees, and recruitment costs;

      b.   Tools, supplies and other equipment required for the job;

      c.   Housing; and

      d.   Daily transportation to and from fields and employer-provided housing.

     32.  Fees categorized as application fees are strictly prohibited from being passed along to the worker. The Department of State currently charges a $205 fee through a contractor for setting up the application appointment and taking biometrics, and a visa application at the consulate. ETA charges a $100 application fee for H-2A 9142 and a $10 per worker certification fee (to a maximum fee of $1,000 per application). USCIS charges an I-129 petition fee (per petition) of $460 or $530 plus $600 asylum. All fees assessed prior to application/petition approval

are application fees and prohibited from being charged to the H-2A worker pursuant to 20 C.F.R. 655.135(J).[1]

33.  After the completion of the application process, any subsequent fees, such as making arrangements for crossing the border into the United States, are not prohibited as a matter of law, but any such deductions may not drop the worker below the H-2A required hourly wage, which was $19.75 in 2024 and currently stands at $19.97. In addition to the specific fees employers are prohibited from charging H-2A workers, employers are also prohibited from making misrepresentations to H-2A workers regarding the terms, working conditions, benefits and wages related to their employment in the United States. As a result, the employer and its agents are prohibited from failing to disclose deductions that they intend to impose once work has commenced. In general, all deductions for expenses that are for the primary benefit of the employer may not be charged to the H-2A worker if the fee will result in the employee's wages going below the H-2A required wage rate. Examples of such fees that are commonly undisclosed are visa fees, border crossing fees,

_____

[1] 20 C.F.R. § 655.135(J) states the following: "The employer and its agents have not sought or received payment of any kind from any employee subject to 8 U.S.C. § 1188 for any activity related to obtaining H-2A labor certification, including payment of the employer's attorneys' fees, application fees, or recruitment costs. For purposes of this paragraph, payment includes, but is not limited to, monetary payments, wage concessions (including deductions from wages, salary, or benefits), kickbacks, bribes, tributes, in kind payments, and free labor. This provision does not prohibit employers or their agents from receiving reimbursement for costs that are the responsibility and primarily for the benefit of the worker, such as government-required passport fees."

and other government-mandated fees related to employment.
Allowable deductions are generally categorized as reasonable and
specified by the job offer or are required by law.

D.      **VISA FRAUD SCHEMES**

34. Based on my training and experience, I know that
employment-based visa fraud schemes generally follow
recognizable patterns, including but not limited to the
following indicia:

a.   Fraudulent recruiters often abuse employment-
based visa programs by preying on foreign workers in difficult
circumstances and selling the temporary work visa to the highest
bidder, which is strictly prohibited;

b.   In other cases, the recruiter will inflate the
number of positions the end-user employer really needs and/or
create bogus companies in order to create a pool of visas that
may be used to shift workers to other employers, sometimes even
outside of the specified industry for which the visa is meant to
be used. Such activity is strictly prohibited because it could
displace willing and able United States workers;

c.   Recruiters, along with end-user employers[2] seeking
workers, submit fraudulent materials in support of the
petitions, including letters and contracts from purported

---

[2] End-user employers are defined as the employer that
employs the foreign worker upon arrival in the United States.
The end-user employer may or may not be the signatory on the
labor certification with DOL or the signatory/petitioner on the
I-129 petition seeking the foreign worker with USCIS. In many
cases, the H-2A worker is petitioned by a consultant and/or
recruiter, who then places the worker at an end-user employer.

companies falsely claiming that the employers have a bona fide employment opportunity for the foreign workers;

        d.   After the petition for foreign workers is approved by the government, fraudulent recruiters send the foreign worker to a different end-user employer to work, or the foreign worker finds work on their own, often displacing United States workers. Other times, the foreign worker remains unemployed.

35.  Based on my training and experience and my participation in this investigation, I understand and am aware that statements in a petition regarding a nonexistent job are material to the government's consideration and evaluation of the petition. The validity of the employer's need for foreign workers, along with compliance with the relevant regulations, specifically including the prohibition of charging fees related to the visa and/or employment, are a material part of the criteria that the government uses to grant or deny H-2A visa applications. Moreover, the discovery of such false and misleading statements in a previously approved application or petition (or supporting documentation) may constitute grounds for immediate revocation or denial of the prior approval. A recruiter can also be disbarred from participating in recruitment activities for a period of up to three years.

      E.     **PRIOR INVESTIGATION OF VASQUEZ**

36.  On May 4, 2018, **VASQUEZ** was indicted by a grand jury in this district (Case No: CR-18-00244-JLS) for violations of 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 1341 (Mail Fraud); 18

U.S.C. § 1546 (False Swearing in Immigration Matter); and 18 U.S.C. § 1351 (Fraud in Foreign Labor Contracting).

37.   On June 5, 2019, **VASQUEZ** pled guilty to one count of violating 18 U.S.C. § 371 (Conspiracy), and one count of violating 18 U.S.C. § 1351(a), 2(a).

38.   According to the plea agreement, **VASQUEZ** charged H-2A visa recipients approximately $1,500 to $3,000 each for the visas. **VASQUEZ** told potential visa recipients that they would be provided with agricultural work and that their visas would be valid for three years; he did not inform the workers that they would be charged for housing, food, and transportation.  As part of the plea agreement, **VASQUEZ** admitted that he charged potential visa recipients, including a Cooperating Source ("CS") and undercover agent ("UC"), fees in connection with obtaining or extending H-2A visas.

39.   On August 21, 2020, **VASQUEZ** was sentenced to 12 months incarceration, followed by 36 months of supervised release by Honorable Judge Josephine L. Staton. **VASQUEZ** was also ordered to pay $135,388 in restitution to the H-2A workers he exploited.

**F.   CURRENT INVESTIGATION OF VASQUEZ AND LOPEZ**

40.   On or about May 8, 2024, the Employment Development Department (EDD) notified the DOL-WHD that it received a call from a H-2A worker from Mexico that arrived in the United States in October 2023, to work for Cuyama Valley Farms. The H-2A worker was supposed to return to Mexico in December 2023; however, the worker was unable to return to Mexico because he owed the employer money. The complainant also alleged that seven

other workers were in a similar situation and were very afraid of the employer.

41.  The complainant alleged that TORRES, the owner of Cuyama Valley Farms, and the same person that had accepted payment from the UC on behalf of **VASQUEZ** in the prior investigation, had charged H-2A workers from Mexico a total of $15,000. The complainant further alleged that a month after arrival, workers were moved from 1220 Perkins Road, New Cuyama to the **SUBJECT PREMISES.**

42.  The complainant further alleged that Cuyama Valley Farms reported to Homeland Security that the workers returned to Mexico, when in fact the workers were still working for the employer in the United States to repay the $15,000 debt owed.

43.  The complainant alleged that TORRES verbally threatened all H-2A workers and their families, stating that he knew people that could make their families heads roll if they reported the abuse to authorities.

44.  According to a Statement of Information filed with the California Secretary of State on March 31, 2025, the principal address for Cuyama Valley Farms LLC is the **SUBJECT PREMISES.** The Chief Executive Officer is listed as TORRES. However, the Statement of Information is signed by **LOPEZ.**

45.  According to law enforcement database checks, **LOPEZ's** most recent residential address, as of December 2024, is the **SUBJECT PREMISES.**

46.   On May 21, 2024, DOL-WHD Investigator P. Modrak (Investigator Modrak) went to Cuyama Valley Farms located at the **SUBJECT PREMISES** and met with **LOPEZ**.

47.   During the visit, **LOPEZ** presented Investigator Modrak with her California driver's license, which Investigator Modrak photographed. **LOPEZ** told Investigator Modrak that she filed the H-2A petitions and processed payroll for Cuyama Valley Farms and other agricultural companies.

48.   DOL-WHD subsequently referred the Cuyama Valley Farms matter to DOL-OIG for criminal investigation, while DOL-WHD completed its regulatory investigation.

49.   On May 21, 2025, DOL-WHD Investigator Modrak went to **SUBJECT PREMISES** and provided **LOPEZ** with a notice of civil monetary penalty payments due for Cuyama Valley Farms in the form of a letter. During the meeting, **LOPEZ** told Investigator Modrak that she rents a portion of the house and land to JJB Farm owner BOJORGES.

   a.   **VASQUEZ Charges Cooperating Witness-1 $15,000 for H-2A Visa to Work at Cuyama Valley Farms**

50.   On June 4th and June 6th, 2024, DOL-OIG and DSS agents interviewed Cooperating Witness 1 ("CW1"), who worked at Cuyama Valley Farms. CW1 provided the following information:

   a.   **VASQUEZ** agreed with CW1's father to bring CW1 to the United States in return for a $15,000 fee. **VASQUEZ** told CW1's father that CW1 would work in construction and finish a fence at **VASQUEZ's** ranch. CW1's father told **VASQUEZ** that CW1 did

not know how to work in the agricultural fields and that CW1's intention was to work in construction.

b.   On or about October 13, 2023, CW1 and other migrants walked across the San Ysidro Port of Entry. Upon being admitted to the United States, an unknown individual picked up the migrants in a commercial van and drove them to Los Angeles, CA, where they picked up **VASQUEZ**. The driver of the commercial van made multiple stops to drop off three of the migrants off at different locations in the Los Angeles area. The van then continued north to Cuyama Valley Farms in Santa Maria, CA.

c.   CW1 resided at **SUBJECT PREMISES** for approximately three months after arriving in Santa Maria, CA. CW1 signed a contract with TORRES, that indicated CW1 would be paid $18.75 per hour; however, CW1 was paid $15.50 per hour. From October 2023 to December 2023, the H-2A workers including CW1 were paid in cash every Saturday and not by check.

d.   Less than a month after CW1 arrived in Santa Maria, **VASQUEZ** held a meeting at **SUBJECT PREMISES** with the 11 migrants, including CW1. During the meeting, **VASQUEZ** told the migrants that the Employment Development Department (EDD) was going to conduct an inspection of H-2A workers' housing. **VASQUEZ** coached the migrants to say they liked their position, were being treated fairly, and got paid by check, even though the H-2A workers were paid by cash. **VASQUEZ** also told the H-2A workers to say they planned on leaving in 90 days in hopes of returning for a new contract. **VASQUEZ** told migrants not to mention **VASQUEZ's** name and to say TORRES ran the operation.

e.   Approximately one month after CW1's arrival, EDD conducted an inspection of the living and welfare conditions for the H-2A workers at **SUBJECT PREMISES**. After the EDD's inspection, **VASQUEZ** began to charge $450 for rent monthly and $10 daily for transportation from the H-2A workers' weekly pay. CW1 was left with an estimated $200 per week after **VASQUEZ** made his prohibited deductions for rent and transportation.

f.   Agents showed CW1 with photographs of **VASQUEZ, LOPEZ**, and TORRES without any identifying information. CW1 confirmed the people in the photos were **VASQUEZ, LOPEZ,** and TORRES.

g.   According to CW1, **VASQUEZ** was allegedly involved in a romantic relationship with one of the female H-2A workers. **VASQUEZ** changed the female's job function from an agricultural worker to office staff, that worked in **SUBJECT PREMISES**. The female worker provided CW1 with a picture from her work computer at **SUBJECT PREMISES**, which showed a spreadsheet of payments made by H-2A workers, including CW1, to **VASQUEZ** for their H-2A visas. CW1 then provided the picture to agents, as seen below.



h.    In December 2023, CW1's H-2A visa expired. CW1 overstayed his visa to repay **VASQUEZ** the remainder of the $15,000 CW1 owed **VASQUEZ** for the H-2A visa.

### b.    Cooperating Witness-2 Paid $12,500 for H-2A Visa

51.    On June 14, 2024, agents interviewed Cooperating Witness-2 (CW2), who provided the following information.

a.    CW2 paid $12,500 to come to the United States from Mexico through his friend, who in-turn paid someone else. CW2 was shown a photograph of **VASQUEZ**, and CW2 identified him as "JORGE."

b.    In October 2023, CW2 entered the United States on an H-2A visa and worked for one month at Cuyama Valley Farms picking strawberries three days a week. CW2 also worked three days a week in construction. CW2 signed a contract indicating that he would be paid $18 per hour while working at Cuyama Valley Farms; however, CW2 was paid $15.50 per hour. CW2 also paid $450 for rent through deductions in CW2's paycheck.

### c.    Cooperating Witness-3 Paid VASQUEZ $8,000 for H-2A Visa

52.    Between June 27, 2025, and July 11, 2025, agents interviewed Cooperating Witness-3 (CW3) multiple times, who provided the following information:

a.    In or around April 2025, CW3's cousin told CW3 that **VASQUEZ** could bring CW3 into the United States on a visa for a fee. CW3 expressed interest to his cousin, who then contacted **VASQUEZ** to initiate the process.

b.   In April 2025, CW3's cousin paid **VASQUEZ** a $2,500 deposit for CW3's H-2A visa, by sending the payment to Erika Torres via Zelle. According to law enforcement database checks in CLEAR, Erika Torres and **VASQUEZ** shared the same address at 5783 Anna Ct, Fontana, CA 92336 until May 2025.

c.   In or around April 2025, CW3 spoke with **VASQUEZ** over the phone while CW3 was living in Mexico. **VASQUEZ** told CW3 that **VASQUEZ** could get CW3 into the United States on a H-2A visa in return for $8,500. **VASQUEZ** told CW3 that the money would be returned to CW3 in the second year.

d.   On or about May 14, 2025, CW3 traveled from Oaxaca, to Tijuana, Mexico by plane. CW3 and 16 other H-2A workers each paid $150 when they arrived in Tijuana, Mexico for a ride to and from the airport, a ride to the American Consulate, and making an appointment for the visa.

e.   The H-2A workers, including CW3, were provided with a copy of a contract indicating that they would work for JJB Farm LLC. According to the contract, the workers were supposed to be paid $19.97 per hour and reside at the **SUBJECT PREMISES.**

f.   On or about May 24, 2025, CW3 and three other H-2A workers crossed the border and were driven to Santa Maria, CA. Upon arrival, **VASQUEZ** took the workers' passports and visas. The passports and visas were later returned to the workers.

g.   CW3 resided at **SUBJECT PREMISES** for approximately two weeks after moving to the United States and was later moved to a different house with other H-2A workers. There were six

other workers renting rooms at **SUBJECT PREMISES**. Some of those workers had been in the United States for over a year.

h.    When CW3 arrived in Santa Maria, **VASQUEZ** yelled at CW3 and asked for the balance of his debt for the H-2A visa. CW3 borrowed money from his son and brother to pay **VASQUEZ** a total of $7,000.

i.    Per the contract, CW3 and the other H-2A workers were supposed to be paid $19.97 per hour. However, the H-2A workers were paid $16.50 per hour, but were given paychecks that reflect they are paid $19.97 per hour. **VASQUEZ** makes the H-2A workers cash their checks and give him the extra money.

j.    In addition, **VASQUEZ** charges the H-2A workers $450 in rent each month, which is prohibited under the relevant laws.

k.    **VASQUEZ** ran the day-to-day operations of JJB Farm and directed the workers. **VASQUEZ** told the workers that if they did anything wrong he would take the workers to Tijuana. There was fear amongst the workers that they could be removed if they did something wrong.

l.    CW3 explained that **VASQUEZ** does not have enough work for the H-2A workers, so **VASQUEZ** sends the workers to work for other growers in the area. The other growers pay **VASQUEZ**, who deducts his portion and pays the H-2A workers the difference.

m.    On June 27, 2025, CW3 told **VASQUEZ** that he wanted to leave the farm. **VASQUEZ** told CW3 that he would have to pay $4,000 more in order to go.

24

53.  On June 27, 2025, at the direction of law enforcement, CW3 made a consensually monitored phone call to **VASQUEZ** to tell him he wanted to move out of state. **VASQUEZ** told CW3 that it would cost a total of $12,500. CW3 reminded **VASQUEZ** that CW3 already paid $7,000. **VASQUEZ** said that he did not have the totals right now, but CW3 would need to pay the difference.

54.  On July 11, 2025, CW3 paid a co-conspirator of **VASQUEZ** $5,000 in person using confidential funds for his H-2A visa. The co-conspirator provided CW3 with a receipt for the $5,000 payment.  The payment from CW3 to Perez was recorded at the direction of law enforcement.

55.  On July 12, 2025, at the direction of law enforcement, CW3 called **VASQUEZ** to confirm that **VASQUEZ** knew CW3 had paid the co-conspirator. **VASQUEZ** told CW3 that everything is fine and not to worry about it.

56.  On September 12, 2025, at the direction of law enforcement, CW3 called **VASQUEZ**.  During the conversation, **VASQUEZ** told CW3 that if someone wants to come and work, it is $8,500.  **VASQUEZ** told CW3 that the person must pay $3,000 when they sign up and pay the remainder when they come to work. **VASQUEZ** said he would pay CW3 $500 for referring the worker to **VASQUEZ**.

57.  During the same conversation, **VASQUEZ** said if the person does not want to work, the cost is $13,000.  The person must pay $3,000 to sign up and $10,000 when they arrive and leave.

### d.    Review of USCIS Forms I-129 for Cuyama Valley Farms LLC and JJB Farm LLC

58.    On or about February 12, 2024, USCIS received Form I-129 from Cuyama Valley Farm LLC via FedEx. Question number eight on the I-129 Form asks if any H-2A workers that Cuyama Valley Farms requested paid a prohibited fee related to the employment or have an agreement to pay such a fee at a later date. The answer provided is "No," and is signed by TORRES.

59.    On or about March 28, 2025, USCIS received Form I-129 from JJB Farm LLC, via UPS. In response to the same question, the answer provided is "No," and is signed by BOJORGES.

60.    On or about July 29, 2025, DOL received a Form ETA-790 from JJB Farm LLC requesting 34 more H-2A workers. The period of intended employment listed on the Form ETA-790 is from October 1, 2025, to February 28, 2026.

61.    On or about August 26, 2025, **LOPEZ** emailed DOL-ETA with a copy of a recruitment report on behalf of JJB Farm LLC. The signature line contains **LOPEZ's** name along with the title "Preparer."

## IV. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

62.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

63.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of a physical location for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

64.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

　　　　b.　In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.　Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.　I do not know the passcodes of the devices likely to be found in the search.

　　65.　Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **VASQUEZ's** or **LOPEZ's** thumb and/or fingers on the device(s); and (2) hold the device(s) in front of their faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

### V.　<u>ITEMS TO BE SEIZED</u>

　　66.　A list of specific items to be seized is attached hereto and incorporated herein by reference as Attachment B. Based on the information related to this affidavit, I respectfully submit that there is probable cause to believe that the items in Attachment B, which constitute evidence of the Subject Offenses, will be found at the locations listed in Attachment A.

## VI. <u>CONCLUSION</u>

67.  For all the reasons described above, there is probable cause to believe that **VASQUEZ** has committed violations of 18 U.S.C. § 1351 (Fraud in Foreign Labor Contracting).  There is also probable cause that evidence of violations of the Subject Offenses, as described above and in Attachment B of this affidavit, will be found in a search of the **SUBJECT PREMISES** and on the persons of **VASQUEZ** and **LOPEZ,** as further described above and in Attachment A-1 through A-3 of this affidavit.


_____
Michael Blas, Special Agent
DOL-OIG

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 4th day of
November, 2025.

_____
HONORABLE BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE